**PUBLIC SERVICE COMPANY OF COLORADO, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

OXY USA Inc., et al., Intervenors.

Nos. 94–1418, 94–1481, 94–1489 and 95–1138.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 12, 1996.

Decided Aug. 2, 1996.

Mark L. Evans argued the cause for petitioner Anadarko Petroleum Corporation, et al. (Producer Petitioners), with whom John S. Martin was on the briefs. Thomas R. Schwarz, Jr., Jefferson City, MO, argued the cause for petitioner Missouri Public Service Commission, with whom David W. D'Alessandro and Kelly A. Daly, Washington, DC, were on the briefs. Karol L. Newman, Washington, DC, argued the cause for petitioners Public Service Company of Colorado and Cheyenne Light, Fuel and Power Company, with whom James D. Albright, Denver, CO, was on the briefs.

Eric L. Christensen, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent, with whom Jerome M. Feit, Solicitor, was on the brief.

Thomas R. Schwarz, Jr., Jefferson City, MO, and David W. D'Alessandro, Washington, DC, were on the brief for intervenor Missouri Public Service Commission. Penny G. Baker, Jefferson City, MO, entered an appearance. Emery J. Biro, III, Houston, TX, Jay G. Martin, Douglas F. John, Washington, DC, Kevin M. Sweeney, Kerry R. Brittain and Norma J. Rosner were on the brief for intervenors in support of respondent. Mark L. Evans, Jay G. Martin, Washington, DC, Marge O'Connor, J. Stephen Martin, Houston, TX, and Kerry R. Brittain were on the brief for the Producer Intervenors. Gary W. Boyle, Tulsa, OK, was on the brief for intervenor Williams Natural Gas Company. Martin J. Bregman, Topeka, KS, entered an appearance for intervenor Western Resources, Inc. Donald C. Shepler, Jr., Washington, DC, and James Howard entered appearances for intervenor Colorado Interstate Gas Company. Bruce A. Connell, Houston, TX, entered an appearance for intervenor Conoco, Inc. Michael L. Pate entered an appearance for intervenor OXY USA, Inc. Frank X. Kelly, George J. Meiburger, Mark C. Schroeder and Steve Stojic, Washington, DC, entered appearances for intervenor Northern Natural Gas Company. Kathy L. Cox, Fort Worth, TX, entered an appearance for intervenor Union Pacific Resources Company. Andra B. Greene, Newport Beach, CA, and Buddy J. Becker, Lakewood, CO, entered appearances for intervenor K N Energy, Inc. Thomas R. O'Donnell, Denver, CO, entered an appearance for intervenor Public Service Company of Colorado and Cheyenne Light, Fuel and Power Company. Andrew N. Greene, Washington, DC, and Elisabeth Y. Pendley, Arglington, VA, entered appearances for intervenor K N Interstate Gas Transmission Co. James F. Moriarty, Washington, DC, entered an appearance for intervenor Missouri Gas Energy.

Before: WILLIAMS, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Concurring Opinion filed by Circuit Judge SENTELLE.

GINSBURG, Circuit Judge:

Until 1993 the Natural Gas Policy Act (NGPA) established the maximum lawful price that a producer could charge its pipeline customers for natural gas; under § 110 of the Act, the producer could adjust that price upward in order to recover its payment of a state severance tax. The Federal Energy Regulatory Commission, on remand from our decision in *Colorado Interstate Gas Co. v. FERC*, 850 F.2d 769 (1988), held that *ad valorem* taxes levied by Wyoming and Colorado are, but the *ad valorem* tax levied by Kansas is not, a severance tax within the meaning of § 110. The Commission then ordered producers to refund payments received from pipelines in recovery of the Kansas tax with respect to production occurring after the *Colorado Interstate* decision. The Commission directed the pipelines in turn to channel those refunds to their customers, but decided not to make the pipelines liable for any amounts not received from producers.

Petitioner Public Service Company of Colorado and a subsidiary (jointly PSCC), supported by the Missouri Public Service Commission (MPSC) as an intervenor, challenge the Commission's authority to limit the retroactivity of the producers' liability for refunds of the Kansas tax. As a petitioner the MPSC also objects to the Commission's order relieving Williams Natural Gas Company of any obligation to guarantee the refund of the Kansas taxes that Williams collected from its customers, as to which Williams intervenes in support of the FERC, and to the Commission's decision that the Wyoming and Colorado taxes are severance taxes.

Four producers petition for review of the Commission's decision that the Kansas tax is not a severance tax. These Producer Petitioners also maintain that the FERC's decision worked a change in the law that should be applied prospectively only. As Producer Intervenors the same group argues in the alternative that the Commission properly limited their liability for the refunds of the

Kansas tax to the date of the *Colorado Interstate* decision. Joined by another producer, the five so-called Indicated Producers intervene in support of the Commission regarding the Wyoming and Colorado taxes.

We conclude that the Commission could properly determine that the Kansas *ad valorem* tax was not, and that the Colorado and Wyoming *ad valorem* taxes were, sufficiently similar to a severance or production tax to qualify for recovery under § 110 of the NGPA. Contrary to the Commission, however, we hold that the producers must refund all the Kansas taxes they collected since October 1983 when all interested parties were first put on notice that the taxes might not be recoverable under § 110. On the question whether Williams should be required to guarantee the refunds due from its producers to its customers, we find no ground upon which to require that the FERC hold the pipeline liable.

### I. Background

From 1978 until 1993 producer prices for natural gas were subject to maximum lawful levels specified in the NGPA. 15 U.S.C. §§ 3311–19. Section 110 of the NGPA permitted a producer to charge an amount in excess of those ceilings to the extent necessary to recover its payment of "State severance taxes attributable to the production of such natural gas," 15 U.S.C. § 3320(a)(1). For this purpose, a severance tax was defined as "any severance, production, or similar tax, fee, or other levy imposed on the production of natural gas" by a state or Indian tribe, 15 U.S.C. § 3320(c).

In *Sun Exploration and Production Co.*, 36 FERC ¶ 61,093 (1986), the Commission determined that the Kansas *ad valorem* tax qualified as a severance tax under § 110 because it was based upon production factors. In *Colorado Interstate* we concluded that the Commission's analysis in *Sun Exploration* "fell short of reasoned decision-making," and we remanded the matter for a more "cogent theory of what makes a tax 'similar' to a production or severance tax under § 110." 850 F.2d at 770, 773. Reflecting our indulgent standard of review for a question so bound up in administrative policy-making,

we noted that while the court "cannot defer to a vacuum," we would defer to "any Commission interpretation of § 110 that is not precluded by the statutory language and traditional methods of statutory construction, and that is reasonable." *Id.* at 774.

We also offered the Commission some guidance. A severance tax is a cost imposed upon producing, while a property tax is a cost imposed upon holding, a resource; the non-recoverability of a severance tax is a disincentive to produce, while the non-recovery of a property tax is not a disincentive and, to the extent that extraction reduces the value of the reserves to which the property tax is applied, might even be an incentive to produce. *Id.* at 771. On the other hand, if in computing the value of a property for the purpose of levying a property tax "a state sought to capitalize the annual production (or revenue) enjoyed by each producer by multiplying it by a single fixed figure, the [property] tax would plainly be similar enough to a production tax to qualify under § 110." *Id.* at 772.

Upon remand, the Commission identified two essential differences between a severance tax and a property tax:

> First, a . . . severance tax is *on* the volume or value of the commodity *removed*, as assessed at the time of removal. A property tax . . . is on the value of the gas remaining in the ground as well as on the value of wells and other production assets on the lease, at the time of the tax assessment.
>
> Second, . . . once the unit of gas is produced and the severance tax is applied to it, that unit of gas is never again subject to the severance tax. On the other hand, a property tax . . . is applied to a unit of gas reserves each year—year after year—until that unit of gas finally is produced and removed from the property being valued.

*Colorado Interstate Gas Co.*, 65 FERC ¶ 61,-292 at 62,370–71 (1993) (emphases in original) (hereinafter *Colorado Interstate Remand Order*), *reh'g denied*, 67 FERC ¶ 61,209 (1994) (hereinafter *Colorado Interstate Rehearing Order*). Applying these distinctions, the Commission concluded that the Kansas tax

did not qualify as a severance tax for three principal reasons: (1) it was based upon the value of the gas property rather than upon its current production; (2) the volume of production was relevant principally for determining the present value of the gas reserves; and (3) the reserves were taxed year after year until removed from the ground and sold. *Id.* at 62,371–72.

The Commission ordered producers to refund the Kansas taxes they had collected since June 1988, the date of our *Colorado Interstate* decision which, in the FERC's view, first put producers on notice that the tax might not be recoverable under § 110. *Id.* at 62,373. The Commission also ordered pipelines to flow-through the refunds to customers as lump sum payments, but the pipelines were not held responsible for guaranteeing payment if a producer failed to meet its refund obligation. *Id.* at 62,374.

Williams, one of the pipelines ordered to refund the Kansas tax, had also collected Wyoming and Colorado *ad valorem* taxes from its customers. In *Williams Natural Gas Co.*, 69 FERC ¶ 61,373 (hereinafter *Williams Order*), *reh'g denied*, 70 FERC ¶ 61,202 (1994) (hereinafter *Williams Rehearing Order*), the Commission held that the Wyoming and Colorado taxes qualified as severance taxes under § 110. The Wyoming tax "is assessed on the volume or value of the gas which is produced" and "varies directly, and exclusively, with actual production." *Id.* at 62,408. The Colorado tax is "assessed only against gas that is severed from the ground." *Id.* at 62,410. Therefore, Williams was not required to refund these taxes to its customers.

## II. Analysis

We turn first to the question whether the Commission was reasonable in holding that the Kansas tax was not recoverable under § 110. Next we undertake a similar inquiry with respect to the Colorado and Wyoming taxes. Then we examine the date to which refund liability for the Kansas tax extends; and finally we review the FERC's decision not to hold Williams responsible as a guarantor in the event that a producer does not meet its refund obligation.

## A. The Kansas Tax

■ Our review of the Commission's interpretation of § 110 of the NGPA is governed by the familiar analysis of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984): if the Congress has "directly spoken to the precise question at issue," the court "must give effect to the unambiguously expressed intent of Congress"; otherwise the court will defer to the administering agency's interpretation if it is reasonable in light of the structure and purpose of the statute. *Id.* at 842–43, 104 S.Ct. at 2781–82. In this instance, recall that § 110 of the NGPA permits a producer to "recover ... State severance taxes attributable to the production of ... natural gas and borne by the seller," 15 U.S.C. § 3320(a)(1), and that a severance tax is defined as "any severance, production, or similar tax, fee, or other levy imposed on the production of natural gas." 15 U.S.C. § 3320(c). In their application to a particular state tax, any or all of the terms "attributable to the production," "similar," "other levy," and "imposed on the production" may be ambiguous. Plainly, as the Producer Petitioners acknowledge, our standard of review is that of *Chevron* step two.

The Kansas tax is levied primarily upon the value of recoverable reserves and secondarily upon the value of gas well equipment and materials. In estimating the volume of reserves, the volume of current production is an important factor; therefore, because the tax is partly dependent upon production, the Producer Petitioners allege that it is similar to a production tax.

In remanding *Colorado Interstate* we instructed the Commission to come up with a "cogent theory of what makes a tax 'similar' to a production or severance tax under § 110." 850 F.2d at 773. The agency's determination was to hinge upon "how the specific rules of the tax actually function." *Id.* at 774. According to the Producer Petitioners, however, the Commission responded largely by ignoring the practical application of the Kansas tax and its actual effect upon production incentives, and focused instead upon mere labels.

The principle advanced by the Producer Petitioners is that "a tax whose assessment is measurably affected by a change in the level of production is at least in part attributable to, and effectively imposed on, the production itself." The Petitioners remind us that the Federal Power Commission held that the Kansas tax was recoverable under the Natural Gas Act, Opinion No. 699–D, 52 FPC 915, 915–16 (1974), and that the Congress incorporated into § 110 of the NGPA terms virtually identical to those it had used in the prior statute, *see* Opinion No. 699, 51 FPC 2212, 2301, 4 P.U.R.4th 401, *reh'g denied in relevant part*, 52 FPC 1604 (1974), *aff'd sub nom. Shell Oil Co. v. FPC*, 520 F.2d 1061 (5th Cir.1975)—which suggests that the Congress intended no significant contraction in the range of severance taxes that could be recovered. Indeed, the Conference Committee Report on § 110 states that the term "severance tax" should be "construed broadly" and may extend to "any tax imposed upon mineral or natural resource production including an ad valorem tax or a gross receipts tax." H.R. CONF. REP. No. 95–1752, 95th Cong., 2d Sess. 91 (1978), U.S.Code Cong. & Admin.News 1978, pp. 8800, 8861.

The two characteristics of a tax recoverable under § 110, in the view of the Producer Petitioners, are that its calculation is directly related to the rate of current production and that its non-recovery would operate as a disincentive to produce. It is not necessary that the tax be attributable exclusively to production, nor that it be computed in the same manner as a severance or production tax; it is enough that the assessed liability be to some extent "attributable to the production of . . . natural gas." The Producer Petitioners claim that the FERC's interpretation—under which the tax must be (1) laid upon "the act of severing," (2) "each Mcf or MMBtu of gas production," and (3) assessed "at the time of removal," *Colorado Interstate Remand Order*, 65 FERC at 62,370, 62,371—effectively reads the term "similar tax" out of the statute.

Applying their more liberal construction of § 110, the Producer Petitioners contend that the Kansas tax fully satisfies the criteria for recoverability. First, while the tax is also affected by variables other than production, the amount of the tax increases or decreases as production increases or decreases. For example, as between two wells with the same reserves, the one expected to produce more gas will be taxed at a higher level. This argument, however, does little to dispel our understanding that the Kansas tax is by its terms a tax upon property. The value of a depletable asset is a function of its physical and its temporal dimensions; in the case of a gas well, these are respectively the volume of recoverable reserves and the timing of their recovery, which progressively depletes the reserve. The greater the volume of gas produced in a given tax year, the shorter the time over which all the proceeds will be realized and, consequently, the higher the present value of the asset.

The relevant question, therefore, is the obverse of the one suggested by the Producer Petitioners. We do not ask whether two wells with the same reserves would be taxed differently based upon their different anticipated rates of production; obviously they would be, whether the tax is imposed *ad valorem* upon property or upon production. The value of the reserves would be higher for the well with more rapid production because faster production reduces the time over which the flow of gas is turned into a stream of cash. Instead, we must inquire whether the same tax would be levied upon two wells with different reserves but the same level of production. If the tax is based upon production, then the amount of the tax would be same; if the tax is based upon property, then the amounts would be different. By this criterion, as we shall see, the Kansas tax is laid upon property, not upon production.

In *Colorado Interstate* we posited that the high initial level of production caused by the pressure in a new well could, when annualized in accordance with Kansas's method of appraisal, yield a higher tax upon a property that started operation late in the year than upon an equally productive property that was in operation for the full year. 850 F.2d at 773. Prompted by that observation, the Producer Petitioners now attempt to explain that the State's use of an annualized figure for production when a new well operates for only

part of its first tax year does not relax the relationship between the amount of the Kansas tax and the volume of production. To the contrary, they point out that a 1980 amendment to the Kansas tax law was designed to offset the disproportionately high levy on a well in operation less than six months during the tax year by reducing its appraised value by 40 percent.

Again, the Producer Petitioners' argument supports not their position but the Commission's. As the agency properly observes, an adjustment for the exaggerated level of initial production caused by the high pressure in a new well would be unnecessary if the Kansas tax were indeed based upon production. Any gas produced would be taxed; any gas left in the ground would not be taxed. Kansas authorized an adjustment precisely because its tax is based not upon production but upon gas in the ground; *i.e.*, the State needed a reliable estimate of "annual" production to use in calculating the present value of recoverable reserves. Otherwise there would have been no need to annualize the partial year's output from a new well.

The Commission gave three reasons for rejecting the "measurably attributable to production" standard suggested by the Petitioners. First, it is just the type of murky standard that this court had criticized in *Colorado Interstate. Colorado Interstate Rehearing Order,* 67 FERC at 61,654. Second, the standard is cumbersome to administer; it requires "virtually well-by-well analysis to ascertain exactly how much weight the state property appraiser gave to current production." *Id.* at 61,654–55. Third, simply providing that a tax be measurably related to production does not distinguish between a severance tax and an array of other taxes— income, personal property, real estate—that could vary "in a more-or-less direct manner with production." *Id.*

What is required, contends the Commission, is that the tax vary "directly" with production on "essentially" a one-to-one basis. *Colorado Interstate Rehearing Order,* 67 FERC at 61,655. Indeed there is some support for that proposition in the history of § 110. In 1974 the Federal Power Commission interpreted the Natural Gas Act to allow

recovery of the Kansas tax. Opinion No. 699–D, 52 FPC at 915–16. As we observed in *Colorado Interstate,* however, when the Congress enacted § 110 it supplemented the FPC's formula for recovery ("all ... production, severance, or similar taxes," Opinion No. 699, 51 FPC at 2301) with the added requirement that the tax be "imposed on the production of natural gas." 850 F.2d at 772. That new qualification is the basis upon which the Commission argues for a one-to-one relationship between the volume of production and the amount of the tax.

The Kansas tax, according to the FERC, is a property tax levied upon the value of recoverable reserves, gas well equipment, and materials, *id.* at 62,374; current production is only a "yardstick by which the value of the leasehold is measured," *id.* at 62,371–72. The appraised value of the reserves depends upon the estimated future production of the well (as determined in part by actual production over the most recent three- or five-year period) and market prices, reduced by operating costs, all forecasted over the probable period of production and discounted to present value. *See Colorado Interstate,* 850 F.2d at 771. Because of differences in the anticipated rate of production and in the estimated quantity of reserves, the tax upon two wells producing the same volume of gas may "vary nearly by a factor of ten." *Id.*

At oral argument, we asked counsel for the Producer Petitioners whether in practice the tax on a well varies over time in direct relation to the well's production. If not, the tax could not properly be characterized as being based upon production. Because the answer to this question has important implications, we take a moment to examine the mechanics of the tax calculation in somewhat greater detail.

The value of recoverable reserves, for the purpose of the Kansas tax, is based predominantly upon the value of the well's average production multiplied by a "present worth factor." The present worth factor, in turn, depends upon the estimated quantity of the reserves, the time value of money, the expected rate of change in the price of gas, and the expected rate of change in production. The Kansas Department of Revenue promul-

gates a present worth factor for use in valuing all properties in a major proven gas field. Assuming that the Department determines present worth factors *ex ante* and does not revise them periodically, then the only variable affecting the annual appraisal of a well is the value of the well's production. Under these circumstances, the Kansas tax would, in our view, be sufficiently like a tax "imposed on the production of natural gas" to be recoverable under § 110. Although the tax is called an *ad valorem* tax and calculation of the tax is based upon the present value of recoverable reserves, any change in the amount of the tax due would depend in practice entirely upon a change in the value of production from year-to-year.

The question, therefore, becomes whether there is a change over time in the present worth factor for a particular well or field. If so, then the tax will depend upon the magnitude of that change (and upon any variation in production, of course). In fact, because increased production diminishes the remaining recoverable reserves, and thus typically reduces the anticipated life of a well, periodically updating the present worth factor could yield a tax that is completely unrelated to, or even negatively correlated with, production. Counsel for the Producer Petitioners was not able to refer us to any evidence in the record indicating that the present worth factor for a single field remains constant over time. Therefore, the Petitioners could not show that the Kansas tax necessarily varied in direct relation to production.

Because the Producer Petitioners bear the burden of showing that the Commission's analysis of the Kansas tax is unreasonable, their inability to demonstrate that the present worth factors are invariant over time could have been an end to the matter. Nonetheless, we searched the record independently—but the result was only to increase our confidence that variables other than production can have a material impact upon the tax assessed. Tables captioned "Major Proven Gas Areas and Fields" show a substantial change in the present worth factor for certain fields over the three years from 1986 to 1989. Indeed, the prevailing pattern is for the present worth factor to decline with the passage of time, which is what we would expect. As the anticipated life of a well declines, the present value of the recoverable reserves decreases correspondingly; that is consistent with our hypothesis that higher production foreshadows a diminished remaining life, which in turn can result in not a higher but a lower tax.

■ There is more. One appraiser for the Kansas Department of Revenue has identified seven factors other than current production that he considers in determining the present value of reserves: age of the well; quality of the oil and gas; nearness to market; operating costs; character, extent, and permanency of the market; probable life of the well; and the number of other wells being operated. Furthermore, Kansas assesses the tax upon each physical unit of reserves, year after year until the unit is produced. In order to qualify as a severance or production tax under § 110, however, a physical unit must be taxed only once—at the time of production. *Colorado Interstate Remand Order*, 65 FERC at 62,371. The Commission also observes that a typical well in the Permian Basin, roughly 2800 feet deep, will be appraised at a value that includes $56,000 for equipment alone, *i.e.*, exclusive of the value of any gas reserves. Even after a well has been shut-in for two years the equipment on a "normal" well is valued at $4,200. If the Kansas tax were based upon production, then there would be no tax on a non-producing well.

Singly and cumulatively, the Commission's arguments are convincing and neither of the Producer Petitioners' two principal contentions persuade us otherwise. First, the Producer Petitioners contend, mistakenly, that non-recovery of a property tax based in part upon production operates as a disincentive to produce and thus defeats a primary objective of the NGPA. If the present value of reserves is computed by the Kansas formula, then (other things being equal) the higher the tax rate the greater the incentive to produce. Although higher production is a factor tending to increase the Kansas tax this year, it reduces the expected future production from the well, a factor tending to decrease the Kansas tax in all future years.

The tax-reducing effect of decreased life expectancy will almost always exceed the tax-increasing effect of higher production.[1] In short, if demand is inelastic (as it would be when the ceiling is well below market price), a recoverable tax would have little effect upon production at the margin; but a non-recoverable tax would be an incentive to extract gas more rapidly in order to minimize the impact of the tax.

Second, the Petitioners advance the theory (in their Reply Brief) that "a tax qualifies for reimbursement under § 110 ... if production is a factor in the calculation." By that standard, an ordinary property tax would qualify as a tax on production; the value of any asset is, after all, the present worth of the benefits that the asset is expected to produce—whether impounded in an established market price or estimated by an appraiser. The Commission reasonably declined to adopt a standard—overbroad, administratively cumbersome, and almost infinitely elastic—with so little to recommend it.

■ Weighing the various arguments—and mindful that as we said in *Colorado Interstate,* "any Commission interpretation of § 110 that is not precluded by the statutory language and traditional methods of statutory construction, and that is reasonable, will control," 850 F.2d at 774—we conclude that the FERC's interpretation of § 110 of the NGPA is reasonable. Furthermore, applying that interpretation, the Commission reasonably determined that the Kansas *ad valorem* tax is not a severance tax within the meaning of that section.

### B. The Colorado and Wyoming Taxes [2]

The MPSC, while agreeing with the Commission's interpretation of § 110, urges that the FERC incorrectly applied its own criteria when it allowed recovery of the Colorado and Wyoming taxes. In the *Williams Order,* the Commission stated that "the Wyoming *ad valorem* tax qualifies for recovery ... in that it is assessed on the volume or the value of the gas which is produced rather than upon the value of gas reserves or lease-hold property. Hence, the tax varies directly, and exclusively, with actual production." 69 FERC at 62,408. The Commission adopted the same rationale in deciding that the Colorado tax could be recovered under § 110. *Id.* at 62,410. The MPSC asserts that this rationale conflates a production-based tax with a property tax.

According to the MPSC, the Wyoming and Colorado taxes are based upon proceeds, not upon production. Taxing authorities administer a proceeds tax as they do a property tax: the underlying property is placed on both state and local tax rolls and aggregated with other property to determine the appropriate state and local *ad valorem* tax rates. A production tax, by contrast, is a state-wide levy subject to a single state-wide rate, administered by and for the benefit of the state and not of the locality. The MPSC contends that the Wyoming and Colorado taxes differ from a typical property tax only in that they

---

1. Suppose, for example, a well with 1,000 Mcf of reserves at year end 1995 is taxed at the rate of $1 per Mcf remaining on December 31 of each year. The producer would have an incentive to deplete the well as quickly as possible. Production of 500 Mcf on January 1 of both 1996 and 1997 would mean tax assessments of $1,000 and $500 on December 31 of 1995 and 1996 respectively. By comparison, production of 250 Mcf on January 1 of each year from 1996 through 1999 would mean tax assessments of $1,000, $750, $500, and $250 on December 31 of each year from 1995 through 1998—and a much higher total tax. (This assumes of course that the estimated volume of reserves does not change from year to year except to account for the previous year's production.)

2. The Indicated Producers claim that the MPSC is barred from contesting the Colorado and Wyo-

ming taxes because the MPSC was some hours late in filing its request for rehearing the *Williams Order.* The FERC, however, waived the 30–day limit in the NGPA, 15 U.S.C. § 3416(a)(2), and accepted the MPSC request as timely filed, *Williams Rehearing Order,* 70 FERC at 61,633. The Indicated Producers argue that the FERC had until then consistently treated the 30–day limit as a jurisdictional requirement that it could not waive. The MPSC replies that the Indicated Producers failed to request rehearing of the Commission's decision to waive the time limit, and thereby failed to preserve the issue for judicial review. We agree. *See* 15 U.S.C. § 3416(a)(4) (no judicial review unless issue raised before agency in application for rehearing). We proceed therefore to address the question whether the Colorado and Wyoming taxes were recoverable under § 110.

grant a preference to natural gas property over other types of property. In Wyoming, the preference arises by taxing gas property only once, which is to say when the gas is extracted. In Colorado, gas reserves are taxed annually but their value is assumed to equal a specified percentage of the value of the prior year's production. Otherwise, according to the MPSC, the Wyoming, Colorado, and Kansas taxes are similar and ought to be treated similarly under § 110; the Wyoming and Colorado legislatures may be free to favor gas producers over other property owners, but the Congress did not intend to favor gas producers in states with a tax based upon proceeds over gas producers in states that impose upon them a traditional property tax.

The Commission responds, first, that the Wyoming *ad valorem* tax meets the criteria set forth in the *Colorado Interstate Remand Order* and applied in the *Williams Order*, 69 FERC at 62,408. The tax is assessed upon the volume of gas removed from the well, Wyo. Stats. § 39–2–208; payable "one time only ... as a result of production," *Union Pac. Resources Co. v. State*, 839 P.2d 356, 372 (Wyo.1992); and based upon the "full value" of the gas when produced, *id.* at 372 n. 7. Second, that the tax may benefit local taxing units is not pertinent; a tax imposed "by any political subdivision of a State" is recoverable under § 110. 15 U.S.C. § 3320(c)(2). Third, as this court has recognized, "a tax nominally on property may be functionally identical to a production tax," *Colorado Interstate*, 850 F.2d at 772. Fourth, a tax need not be labeled a "severance tax" in order to be "recoverable" within the meaning of § 110; the term "severance tax" is to be "construed broadly," and may include an *ad valorem* tax, H.R. CONF. REP. No. 95–1752 at 91, U.S.Code Cong. & Admin.News 1978 at 8861, as well as any "similar tax, fee, or other levy imposed on the production of natural gas," 15 U.S.C. 3320(c).

■ Finally, the Commission argues that administrative differences between a tax based upon production and an *ad valorem* tax are irrelevant to the question whether the tax may be recovered under § 110. Indeed, Wyoming has a separate severance tax, which no one here doubts is recoverable within the meaning of § 110. In distinguishing that tax from the state's *ad valorem* tax based upon proceeds, the Wyoming Supreme Court observed: "[T]he severance tax is an excise tax upon the current and continuing privilege of extracting minerals.... An ad valorem tax is a property tax which taxes the value of the minerals produced." *Wyoming State Tax Comm'n v. BHP Petroleum Co., Inc.*, 856 P.2d 428, 434 (1993). This characterization of the Wyoming *ad valorem* tax supports the Commission's conclusion that it is based upon production.

Colorado, too, imposes a severance tax in addition to an *ad valorem* tax. The Indicated Producers point out, however, that 87.5% of the *ad valorem* tax may be taken as a credit against the severance tax. This, say the Indicated Producers, proves that the two taxes are "directed at the same activity and intended to accomplish the same purpose, *i.e.*, to tax production as it occurs." Moreover, as the Tenth Circuit noted—albeit in the course of determining whether the Colorado tax is a real estate or a personal property tax, not whether it is sufficiently similar to either a severance or other production-related tax to be recovered under § 110—"[p]ast production is used in the Colorado ad valorem tax system only as a gauge for the valuation of the mineral interest. Use of this admittedly imperfect gauge does not rule out the conclusion that the mineral interest itself is being taxed." *Federal Land Bank of Wichita v. Board of County Comm'rs*, 788 F.2d 1440, 1442 (1986).

■ The Commission nonetheless argues persuasively that the Colorado *ad valorem* tax "varies directly with production" and is "assessed only against gas that is severed from the ground." *Williams Order*, 69 FERC at 62,410. The irreducible fact is that the tax is computed as a set percentage of the market value of the gas removed from a well during the tax year. Colo.Rev.Stat. §§ 39–7–101 and 39–7–102. As we stated in *Colorado Interstate*: When computing the value of property, "[i]f a state sought to capitalize the annual production (or revenue) enjoyed by each producer by multiplying it by a single fixed figure, the [property] tax

would plainly be similar enough to a production tax to qualify under § 110." 850 F.2d at 772. That is precisely how the Colorado tax is computed.

In sum, the clear weight of the arguments supports the Commission's determination. Both the Colorado and Wyoming *ad valorem* taxes are based upon production and as such may be recovered under § 110 of the NGPA.

## C. Retroactivity

■ Next we take up the question whether the Commission properly ordered producers to refund Kansas taxes recovered since, and only since, our *Colorado Interstate* decision in June 1988. The governing principle is that when there is a "substitution of new law for old law that was reasonably clear," the new rule may justifiably be given prospectively-only effect in order to "protect the settled expectations of those who had relied on the preexisting rule." *Williams Natural Gas Co. v. FERC,* 3 F.3d 1544, 1554 (D.C.Cir. 1993). By contrast, retroactive effect is appropriate for "new applications of [existing] law, clarifications, and additions." *Id.* The Commission concluded that "[t]he 'settled expectations of those who had relied on the preexisting rule' ... were changed by the [court's June 1988] *Colorado Interstate* decision, not really [by the FERC's] own decision" in the 1993 *Colorado Interstate Remand Order,* 65 FERC at 62,373.

The Producer Petitioners maintain that the Commission did indeed substitute a new rule for a reasonably clear old rule when, in the *Remand Order,* it first refused to let them recover the Kansas tax. Our decision in *Colorado Interstate,* the Petitioners point out, was a remand, not a reversal, of the Commission's decision in *Sun Exploration* allowing producers to recover the tax. The court directed the Commission only "to exercise its interpretive authority, to identify the features of the Kansas tax that point toward one classification or another, and to offer sensible distinctions between taxes that it

chooses to treat differently." 850 F.2d at 775. We did not indicate that we expected a particular result, and consequently we did not disturb the settled expectations of producers who were relying upon the old rule. Upon this view of the matter, it was precisely the Commission's ruling in the *Remand Order* that did change the governing law; prior to that decision, the Petitioners contend, they did not have reason to anticipate that the Commission would change the rule. As they point out, that the agency had not previously engaged in reasoned decisionmaking did not mean that it could not reasonably reach the same result upon remand. Accordingly, the Producer Petitioners argue that their refund liability should extend back not to June 1988 but only to December 1993.

PSCC, on the other hand, argues that regardless of when the Commission first determined that recovery of the Kansas tax was unlawful, it necessarily had been unlawful since the NGPA was enacted in 1978. After first arguing before the Commission for full retroactivity back to 1978, however, PSCC conceded that "fundamental fairness ... [dictates] that the date on which interested parties were put on notice of the dispute should control the date of retroactivity." Request-for Rehearing, *Colorado Interstate Gas Co.,* Dkt. Nos. GP83–11–003 and RI83–9–004, at 6 (FERC Jan. 3, 1994). Therefore, suggested PSCC, liability for refunds should extend back at most to August 1983, when Northern Natural petitioned the Commission for a determination that the Kansas tax was not recoverable under § 110, or at least to October 1983, when all interested parties received notice of the petition by publication in the Federal Register. *Id.* at 4.[3] As between the two, the later date is obviously the correct one. *See Associated Gas Distribs. v. FERC,* 899 F.2d 1250, 1256 (D.C.Cir.1990) (FERC gives notice of petition by publication in Federal Register).

---

**3.** The MPSC argues for full retroactivity back to 1978, but we agree with the Producer Intervenors that it is precluded from raising that argument before us. The MPSC did not make a retroactivity argument in its request for rehearing before the FERC, and it does so here only as an intervenor, not as a petitioner. *See Illinois Bell Tel. Co. v. FCC,* 911 F.2d 776, 786 (D.C.Cir. 1990) ("An intervening party may join issue only on a matter that has been brought before the court by another party").

To recapitulate, the various parties now urge that when the Commission issued its *Colorado Interstate Remand Order* in December 1993, it should have made liability for refunds (per the Producer Petitioners) prospective-only; (per the Commission) retroactive to June 1988, when we issued our decision in *Colorado Interstate;* or (per PSCC) retroactive to October 1983, when notice of Northern Natural's petition to disallow recovery of the Kansas tax was published in the Federal Register. .

PSCC, the MPSC, and the Commission all argue against prospective-only application. By December 1993 gas at the wellhead was no longer subject to a maximum lawful price; deregulation had rendered § 110 moot almost a year before. *See* Natural Gas Wellhead Decontrol Act of 1989, Pub.L. No. 101–60, 103 Stat. 157. Accordingly, producers would have no liability under a rule that limited refunds to taxes paid on post-December 1993 production. Their point seems to be that customers should not lose their entitlement to refunds merely because the Commission took five years after our decision in *Colorado Interstate* to issue the *Remand Order.*

The FERC makes a more convincing argument against prospective-only application of its 1993 decision based upon this court's criticism in *Colorado Interstate* of both the logical and the factual bases for the agency's prior policy; that sent a "clear signal" to producers that their recovery of the Kansas tax under § 110 might not be lawful. After that "the parties no longer would have been justified in relying on the Commission's earlier rulings with any assurance that they would not later be required to make refunds." *Colorado Interstate Remand Order,* 65 FERC at 62,373.

The Commission marshals the events leading up to the *Colorado Interstate* remand in further support of this compromise view. As we have seen, under the Natural Gas Act, the Federal Power Commission had held in 1974 that the Kansas tax could be added to the maximum lawful rate. Opinion No. 699–D, 52 FPC at 915–16. Four years later the Congress carried forward into the new NGPA a provision nearly identical to the

provision of the NGA that the FPC had earlier applied to the Kansas tax. *See* Opinion No. 699, 51 FPC at 2301. Furthermore, in the legislative history of the NGPA the Congress specifically anticipated that producers might recover an *ad valorem* tax under § 110. H.R. CONF. REP. No. 95–1752 at 91, U.S.Code Cong. & Admin.News 1978, at p. 8861. In 1986 the Commission reaffirmed that the Kansas tax was recoverable under that section. *See Sun Exploration,* 36 FERC ¶ 61,093. Not until our 1988 decision in *Colorado Interstate,* remanding *Sun Exploration,* was there any official suggestion that the law might be otherwise. Finally, in 1993 the Commission effectuated a change in the law by developing new standards for determining whether a tax may be recovered under § 110. Thus, according to the Commission, the producers had no indication that the rule might be any different until our *Colorado Interstate* decision in 1988, and requiring them to refund taxes recovered with respect to gas produced prior to that date is not justified.

The agency also concludes that requiring refunds back to the date of our decision in June 1988 properly balances the producers' equitable claim to notice against the consumers' legal right to receive a refund of all unlawfully collected charges. On the one hand, prospective-only application of the law would permit producers to retain sums collected from June 1988 to December 1993 in excess of the maximum lawful prices prescribed in the NGPA—without any supporting rationale. On the other hand, a fully retroactive remedy would penalize producers by requiring disgorgement of sums they innocently collected prior to June 1988—even though our 1988 *Colorado Interstate* decision was the first authoritative indication that the Kansas tax might not be recoverable after all.

In support of making the Commission's decision retroactive to 1983, PSCC offers a different account, or at least one with a different emphasis, of the transition from the NGA to the NGPA. In this version the key point is that the Commission does not have the expansive remedial powers under the NGPA that it wielded under the NGA, 15

U.S.C. § 717c(e). Specifically, whereas the NGA gave the Commission discretion to order refunds if it determined that a rate was not just and reasonable, the NGPA established maximum lawful prices and gave the customer a right to a refund if it was overcharged.

PSCC also points out that when it issued the *Remand Order* the Commission was not engaged in rulemaking but in adjudicating the rights of the parties before it; therefore the agency was necessarily articulating and giving retroactive effect to existing law. When it is clarifying existing law, rather than substituting new law for old, the agency need not be as attentive "to protect[ing] the settled expectations of those who had relied on the preexisting rule." *Williams,* 3 F.3d at 1554. Indeed, as PSCC points out, the producers never explain how their "settled expectations" led them into detrimental reliance upon being able to recover the Kansas tax.

As we see the issue, the apparent lack of detrimental reliance on the part of the producers is the crucial point. What would they have done differently if they had known in 1983 that they were not entitled to recover the Kansas tax? They could not have raised their prices above the maximum lawful level regardless whether the traffic would have borne such an increase. Nor do they contend that existing prices were below the lawful limit; and if they were, price increases might still have been foreclosed by competitive constraints. The producers may have shut in some wells or refrained from exploring for new wells if their inability to recover the tax would have rendered the wells unprofitable, but neither the producers nor the Commission has even suggested these possibilities. All the producers do suggest is that "[a] prudent producer would have cut back on production to the extent that non-recovery of the tax increased [the] current marginal cost of production," Petition of Producer Petitioners for Rehearing of Order on Court Remand, *Colorado Interstate Gas Co.,* Dkt. Nos. GP83–11–003 and RI83–9–004, at 23 (FERC Jan. 3, 1994), but in this they are mistaken; as noted above, the more slowly a well is depleted, the greater the remaining reserves and the higher the tax thereon. Moreover, neither party has even roughly quantified the harm (*e.g.,* the expenditures made and lost in detrimental reliance upon being able to recover the Kansas tax) that the producers might suffer should they have to refund the full amount that they unlawfully collected. In these circumstances, we are hard pressed to see how the producers would be harmed in any cognizable way even if they were required to disgorge every dollar they received in recovery of the tax (assuming any party were seeking such extensive relief).

Not only is the producers' "detrimental reliance" purely notional; if it were real it would not have been reasonable. The enactment of a substantially new regulatory regime in 1978 undermined any assurance that the FPC's treatment of the Kansas tax under the NGA would withstand scrutiny under the NGPA; reliance would have been foolhardy. If that were not enough, the status of the Kansas tax was expressly drawn into question in 1983 when Northern Natural first petitioned the Commission for a ruling that producers could not lawfully recover the tax under § 110. Once the recoverability of the tax was in dispute, we do not see how the Commission could possibly find that producers reasonably relied upon continuing to recover it.

■ Because no seller of natural gas could justifiably be confident that it was entitled to recover the tax until the legal question was settled anew under the new statute, we hold that the producers' liability for refunds extends back to October 1983, the date when all interested parties were given notice in the Federal Register that the recoverability of the Kansas tax under § 110 of the NGPA was at issue, and the earliest date advocated by any party before this court. Absent detrimental and reasonable reliance, anything short of full retroactivity (*i.e.,* to 1978) allows the producers to keep some unlawful overcharges without any justification at all. The court strongly resists the Commission's implication that the Congress intended to grant the agency the discretion to allow so capricious a thing. Still, we do not require refunds of taxes recovered with respect to pro-

duction before October 1983 because there is before us no controversy over those monies.

### D. The Pipeline as Guarantor

In the *Colorado Interstate Remand Order* the Commission required interstate pipelines to "pass through any *ad valorem* tax refunds they receive from first sellers," 65 FERC at 62,374, but made it clear that "pipelines will not be required to be guarantors of refunds." *Id.* The MPSC, on behalf of the customers of the Williams pipeline, was the only party to challenge that decision. The FERC adhered to its position, however, adding that Williams should not be treated differently than other similarly situated pipelines. *Williams Natural Gas Co.*, Dkt. Nos. TA89–1–43–004 and RP89–39–005, slip op. at 5 (FERC order June 2, 1994), *clarification denied, Williams Order,* 69 FERC ¶ 61,373. The MPSC properly dispatches the FERC's afterthought with the observation that it is routine for one pipeline to be required to make refunds while others are not—because the one is challenged and the others are not.

In its petition for review, the MPSC raises three objections to this aspect of the Commission's decision. First, it observes that under § 4 of the NGA the Commission is authorized to order refunds of any amounts collected from consumers in excess of what is just and reasonable. 15 U.S.C. § 717. Second, the MPSC contends that until the *Colorado Interstate Remand Order* was issued in December 1993, Williams should have understood that when it was allowed to continue collecting from its customers the amount of the Kansas tax "subject to refund," it became conditionally obligated to refund any amount later determined to be unlawful. Indeed, Williams received explicit notice in 1989 that the Commission was considering whether monies collected in recovery of the Kansas tax would have to be refunded. *Williams Natural Gas Co.*, 47 FERC ¶ 61,114 at 61,-341. According to the MPSC, this notice should have prompted Williams to take reasonable steps to assure that it could in turn obtain refunds from its suppliers. Third, the MPSC asserts that the Commission should have required Williams to put the monies it received for the Kansas tax into escrow (or

post a bond or obtain a letter of credit) in order to assure their return if need be. Escrow arrangements are commonly used when a rate increase is conditionally allowed to take effect until the agency determines whether it is lawful. *See, e.g., Transcontinental Gas Pipe Line Corp. v. FERC,* 866 F.2d 477, 479 (D.C.Cir.1989).

The Commission responds, first, that there is well-established precedent for treating pipelines as mere conduits for the flow of refunds from producers to consumers. *See, e.g., Public Utils. Comm'n of Cal. v. FERC,* 24 F.3d 275, 278 (D.C.Cir.1994). Second, the FERC explains that accepting Williams' rates "subject to refund" means simply that the agency would order refunds if appropriate after the remand proceedings in *Colorado Interstate,* not that Williams was expected to pay the tax monies into escrow (or take equivalent steps) in order to assure that they would be available if refunds were ordered. Third, the Commission maintains that it could not have directed Williams to set up an escrow arrangement because the pipeline was obligated by contract to pay producers the amount of the Kansas tax. The Commission points to § 601(c) of the NGPA, 15 U.S.C. § 3431(c), which guarantees a pipeline full recovery of its gas purchase costs.

The Commission's arguments are not convincing. Surely Williams' contractual obligation does not extend to paying to producers sums unlawfully recovered. While § 601(c) requires that a pipeline be allowed fully to recover its gas purchase costs, that provision also authorizes the Commission to deny recovery of costs that are unjust or unreasonable. Moreover, the Commission would not have violated § 601(c) by requiring that the taxes be placed in escrow while the agency determined whether they could indeed be recovered under § 110. An escrow arrangement would have preserved the rights of all parties. If the Commission ultimately decided that the taxes were recoverable under § 110, then the producers would be entitled to the amount in escrow, including any accrued interest. If, as happened, the Commission decided that the taxes were not recoverable, then the amount in escrow could have been refunded to the ratepayers (again,

with interest). In either event, the pipelines would have recovered their full gas purchase costs.

■ Regardless whether the Commission abused its discretion by failing to require an escrow or its equivalent—a matter we need not decide today—the MPSC's petition for review must be denied. Insofar as it seeks prospective relief, the issue is moot: Wellhead prices have been totally deregulated since 1993, there are no longer any maximum lawful prices for producer sales, and whether a producer recovers severance taxes is a matter of negotiation between buyer and seller. As for monetary relief, it is too late now for the Commission to require that Williams pay the severance taxes into escrow; the pipeline has long since paid the monies to the producers.

■ Nor does the MPSC make out any legal or equitable principle that would suggest holding Williams accountable for the Commission's failure to protect consumers. The pipelines were, as the Commission has reminded us, mere conduits; they had no financial interest in this dispute. The Commission's failure to impose an escrow or other arrangement did not benefit the pipelines, and it is not clear why they should be at risk because the FERC may have been remiss. Nor was Williams obliged either by contract or by regulation to take any precaution against the possibility that a producer would fail to refund monies due to consumers. Therefore, there is no ground upon which the court can say that the Commission was required to hold the pipeline—which was charged first with the task of collecting tax payments and then of distributing tax refunds—liable if the responsible producer defaults on its refund obligation.

### III. Conclusion

The Commission's interpretation of § 110 of the NGPA is in all respects reasonable. The Commission properly rejected the Producer Petitioners' proposal that it allow recovery of any tax that was "measurably attributable" to production. That standard is overbroad and unwieldy, and we criticized it as ambiguous in *Colorado Interstate.* The agency reasonably determined that the Kan-

sas *ad valorem* tax is not a severance tax within the meaning of § 110. The Kansas tax is a function of numerous factors other than production, with the result that producers of equal volumes of gas may be taxed very different amounts; and the tax falls upon each unit of reserves each year, rather than once at the time of extraction. Further, the Producer Petitioners are mistaken in their assertion that non-recovery of a property tax based in part upon production is a disincentive to produce.

The Commission reasonably determined that both the Wyoming and the Colorado *ad valorem* taxes were recoverable as severance taxes under § 110 of the NGPA. The Wyoming tax is assessed upon the volume of gas removed from the well; it is a "one time only" tax, based upon the value of the gas when produced. That the state treats the tax as a property tax is of no moment if, in the terms of § 110, it is "imposed on the production of natural gas." 15 U.S.C. 3320(c). The Colorado tax, also administered as a property tax under state law, is computed as a set percentage of the market value of the gas removed from a well during the tax year. That is "plainly ... similar enough to a production tax to qualify under § 110." *Colorado Interstate,* 850 F.2d at 772.

Producers are liable to refund all Kansas *ad valorem* taxes collected with respect to production since October 1983. An agency adjudication should be applied retroactively unless new law is replacing clearly defined old law and reasonable reliance interests must therefore be protected. Here the agency did not change the law—rather, the Congress did when it enacted the NGPA in 1978—nor was there any showing that the producers had relied, let alone detrimentally or reasonably relied, upon the continuing validity of the agency's interpretation of the NGA. There is no substantive reason, therefore, to deny customers all the relief to which they are entitled. The customers are limited, however, to recovery of taxes paid with respect to production since October 1983 because that is the earliest date for which any argument has been preserved in this proceeding for review.

Finally, the court will not require the Commission to make the Williams pipeline a guarantor of the producers' obligation to refund the Kansas tax. Although an escrow arrangement would likely have preserved the rights of all parties, the Commission did not impose one, and no party has pointed to any legal or equitable principle by which the agency can be required to hold a pipeline accountable for the agency's own oversight.

For these reasons, we deny the petitions for review filed by the Missouri Public Service Commission and the Producer Petitioners, and we grant the petition for review filed by the Public Service Company of Colorado.

*So ordered.*

SENTELLE, Circuit Judge, concurring:

I join without reservation in the holding of the court. I write separately only to place a little distance between myself and what I deem to be an overstated dictum. After describing a hypothetical tax, the majority states that with the majority's proposed variations "the Kansas tax would, in our view, be sufficiently like a tax 'imposed on the production of natural gas' to be recoverable under § 110." Maj. op. at 1485. As no such tax is before us, for us to authoritatively render an opinion on what it would be constitutes nothing less than the advisory opinion that Article III courts have held ourselves unable to render since the earliest days of constitutional jurisprudence. *See, e.g., Flast v. Cohen,* 392 U.S. 83, 96, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968) ("[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." (Internal quotations and citations omitted)); WRIGHT, MILLER & COOPER, 13 FEDERAL PRACTICE AND PROCEDURE § 3529.1 (1984) (detailing the long history of the rule forbidding advisory opinions). We have already, in my view, crossed the line of appropriate Article III jurisprudence in dealing with § 110 tax treatment when the prior panel stated "[i]f a state sought to capitalize the annual production (or revenue) enjoyed by each producer by multiplying . it by a single fixed figure, the [property] tax would plainly be similar enough to a production tax to qualify under § 110." *Colorado Interstate Gas Co. v. FERC,* 850 F.2d 769, 772 (D.C.Cir. 1988). I think it time we quit advising state legislatures on how to draft their tax statutes and confined ourselves to construing the statutes actually before us.