# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 2, 2012      Decided November 27, 2012

No. 11-1240

NORTHERN NATURAL GAS COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NORTHERN STATES POWER COMPANY - MINNESOTA, ET AL.,
INTERVENORS

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

*Frank X. Kelly* argued the cause for petitioner. With him on the briefs were *Steve Stojic*, *J. Gregory Porter,* and *Dorothy R. Dornan*.

*Beth G. Pacella*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief was *Robert H. Solomon*, Solicitor.

*Robert I. White* was on the brief for intervenors Northern States Power Company-Minnesota, et al. in support of respondent.

Before: GARLAND and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:  In response to a tariff filing by Northern Natural Gas Company, the Federal Energy Regulatory Commission issued an interpretation of § 4(f) of the Natural Gas Act, 15 U.S.C. § 717c(f).  *Northern Natural Gas Co.*, 133 FERC ¶ 61,210 (2010), *reh'g denied, Northern Natural Gas Co.*, 135 FERC ¶ 61,085 (2011).  Northern objects to the interpretation, and further argues that even if it is correct, its effect, at least vis-à-vis Northern, should be prospective only.  We reject both claims.

\* \* \*

Section 4(a) of the Natural Gas Act requires that a natural gas company's rates be "just and reasonable."  15 U.S.C. § 717c(a).  The Commission has generally understood this to mean cost-based rates, with "market-based" rates to be allowed only for a firm that showed it lacked market power in the relevant market.  See, e.g., *Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines*, 74 FERC ¶ 61,076, at 61,227 (1996).

In 2005 Congress added § 4(f) to the Act to provide another avenue to market rates.  It states that

> (1) the Commission may authorize a natural gas company . . . to provide storage and storage-related

services at market-based rates for new storage capacity related to a specific facility placed in service after August 8, 2005, notwithstanding the fact that the company is unable to demonstrate that the company lacks market power, if the Commission determines that—

> (A) market-based rates are in the public interest and *necessary to encourage the construction* of the storage capacity in the area needing storage services; and

> (B) customers are adequately protected.

15 U.S.C. § 717c(f) (emphasis added).

The next year Northern secured from the Commission a declaratory order authorizing it to charge market-based rates for its services at a new storage expansion project in Iowa. *Northern Natural Gas Co.*, 117 FERC ¶ 61,191 (2006). In granting the authority, the Commission noted that Northern had proposed such rates for shippers that had submitted winning bids in an "Open Season" for use of the capacity and had signed "precedent agreements," and that "the use of market-based rates does not apply to sales of [Northern's] storage capacity *outside of these precedent agreements*." *Id.* at P 9 & n.4 (emphasis added). In its Order on Rehearing, the Commission echoed that thought, mentioning at the outset that the original order had authorized "market-based rates to the initial shippers that submitted winning bids and signed precedent agreements." *Northern Natural Gas Co.*, 119 FERC ¶ 61,072 at P 1.

In 2010, Northern sought to extend its market-based rate authority to the "resale of market-based rate capacity . . . to the extent that such capacity becomes available [1] through expiration of existing market-based rate . . . service agreements or [2] upon bankruptcy or another event leading to turn back of the capacity." Joint Appendix (" J.A.") 11

(brackets added). The Commission rejected the corresponding amendments to Northern's tariff insofar as they related to capacity becoming available on expiration of the existing agreements, explaining:

> To qualify for market based rates under [§] 4(f), the pipeline must show that the storage capacity for which market-based rates is being sought is related to new facilities and can demonstrate that the granting of market-based rates is 'necessary to encourage the construction of the storage capacity.'

*Northern Natural Gas Co.*, 133 FERC ¶ 61,210 at P 11 (2010) ("Order"), *reh'g denied, Northern Natural Gas Co.*, 135 FERC ¶ 61,085 (2011). It went on to emphasize that Northern's request related to "capacity that it has *already* constructed." *Id.* (emphasis in original).

On the other hand, the Commission approved market-based rates for the second set of cases for which Northern requested them, namely resales of storage "in the event of bankruptcy, a default or other turn back during the 20 year term" of the original contracts. Order, 133 FERC ¶ 61,085 at P 12.

\* \* \*

We review the Commission's interpretation of § 4(f) for reasonableness under the familiar standard of *Chevron, USA, Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), which as specified in *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009), means (within its domain) that a "reasonable agency interpretation prevails."

The Commission's interpretation is fully consistent with the obvious meaning of the statute. Subsection 4(f)(1)(A) conditions the approval of market rates under § 4(f) on the

5

Commission's finding that such rates are "necessary to encourage the construction of the storage capacity in the area needing storage services." The Commission's first reading of § 4(f)—which preceded Northern's market-based rates petition—echoed this statutory requirement. *Rate Regulation of Certain Natural Gas Storage Facilities.*, 115 FERC ¶ 61,343 at P 130 (2006). It then spelled the point out in even more direct terms: It observed that the Commission's goal under the statute was to provide an "incentive to build new storage infrastructure," *id*. at P 167, and said that a favorable ruling even on the "public interest" requirement of the section would reflect consideration of all aspects of proposals, "including . . . the strength of the applicant's showing that the facilities would not be built but for market-based rate treatment," *id*. at P 128.

It seems obviously reasonable as a general matter that a special benefit aimed at encouraging an investment can perform that function only with respect to investments not yet made when the favorable treatment is promised. How can a benefit be an incentive to specific conduct if the conduct has already occurred? There can be, of course, special cases where targeting prospective conduct only is too costly to implement. Suppose Congress decides that preferential tax rates for capital gains will encourage investment. It might limit the preference to investments made after the favorable rate was assured; but the costs of sorting out the exact timing of investments, and the need to apply multiple layers of rates as Congress periodically adjusts them up and down, stand in the way of such precision. In such a case, application of the incentives to gains realized on prior investments may make sense. The application of § 4(f), however, seems not to present any comparable difficulty. Certainly Northern identifies none.

We noted that the Commission had ruled in favor of the second element of Northern's request, namely for the right to

charge market rates on the resale of storage "in the event of bankruptcy, a default or other turn back during the 20 year term" of the initial contracts. Order, 133 FERC ¶ 61,210 at P 12. Northern, of course, does not complain about that aspect of the Order, but its presence poses a potential question as to whether the Commission really means to apply the incentive rationale that it adopted at the outset and in the challenged Order. We think the two—the incentive rationale and this element of the Order—can be reconciled. It makes sense for FERC to interpret its grant of market rates for the original 20-year contracts as encompassing replacement contracts that merely fill in a gap caused by the fortuitous failing of one of the original shippers. To be sure, the Commission might have taken the view that Northern did not explicitly raise the issue in its initial request and that the resulting order should be understood to preclude any such gap-filling. But the Commission could readily have seen good reason to avoid that stance. After all, an incentive tends to be less effective if the party extending it gains a reputation for sharp practice.

At oral argument Northern stressed the risks associated with the storage capacity in question, risks that may involve substantial future expenses. The Commission offers an answer—namely that the risky character was readily knowable in advance and that if market rates for more than 20 years were necessary, Northern could have held out for approval of such rates either for longer original contracts or for successor contracts after the initial 20 years. Of course it is possible that new (previously unforeseeable) circumstances will arise requiring heavy additional investment. In some such cases, that additional investment might qualify as the sort of investment that market rates would be "necessary to encourage," and thus (if the other statutory criteria were satisfied) be eligible under § 4(f). There are, in short, answers

to Northern's stated anxiety—answers that fit properly within the statutory language and the Commission's interpretation.

\* \* \*

Northern argues in the alternative that the effect of the Commission's interpretation should be, at least as to its Iowa storage expansion project, prospective only. It rests this argument on language the Commission used in an order resolving one of the many proceedings occasioned by the project. *Northern Natural Gas Co.*, 120 FERC ¶ 61,233 at P 18 (2007) ("2007 Order"). The proceeding revolved around a service agreement that Northern filed with the Commission and that contained a clause granting shippers a "right of first refusal for the capacity stated in the agreement, . . . subject to any rate authority applicable at the time of contract expiration." One of the shippers protested inclusion of the proviso (the "subject to" clause) and asked the Commission to clarify whether it would allow Northern to charge market-based rates indefinitely. Northern contended that the Commission had no need to reach the question, arguing that "[w]hether Section 4(f) would authorize such authority is not an issue in this proceeding," and that by the proviso "Northern was merely providing the expansion shippers the right to retain their firm storage capacity at the end of their agreements, at whatever rate is applicable at that time." J.A. 333-34. In its 2007 Order the Commission effectively took Northern up on that idea, holding that the question of which rates should govern the contracts set to expire some 20 years later would be determined at the point of expiration and not before. In what appears to be dictum, however, the Commission also said that

> if sometime before the expiration of the contract, Northern proposes additional protections against the exercise of market power relating to the sale of

> capacity after the expiration of the primary term of the service agreements, the Commission will determine at that time whether the protections are adequate and the extent to which market-based rates should apply beyond the primary term of the service agreement.

2007 Order, 120 FERC ¶ 61,233 at P 18. The Commission added that "[i]f Northern should satisfy the requirements for extending market-based rates," the protesting shipper's claim to a right of first refusal at regulated rates would fail. *Id.*

Northern now argues that it reasonably and detrimentally relied on this paragraph, invoking the principle that "when there is a substitution of new law for old law that was reasonably clear, the new rule may justifiably be given prospectively-only effect in order to protect the settled expectations of those who relied on the preexisting rule." *Pub. Serv. Co. of Colorado v. FERC*, 91 F.3d 1478, 1488 (D.C. Cir. 1996) (citation and internal quotation marks omitted). We agree with Northern that the language cited appears to suggest that a grant of market rates in the out years was at least a serious possibility, whereas under the Order such a grant would be impossible (subject, arguably, to scenarios such as the one mentioned at the end of our discussion of the main interpretive issue). Nevertheless, for two reasons we do not agree that the Iowa expansion project should be exempted from Commission's current interpretation. First, Northern has not shown that it relied on the language of the 2007 Order in making its investment. Second, it has not demonstrated that, even if it did, such reliance would have been reasonable.

Northern's only real argument tracing its investment to the 2007 Order is chronological: it began construction after the 2007 Order, but before the current order. While the construction schedule may be *necessary* to show detrimental

reliance, it is surely not sufficient—it fails to show that the Commission's statement was the, or even a, deciding factor in its decision to proceed. The multiple proceedings actually gave Northern an opportunity to lay the groundwork for such a claim, which Northern in fact seized with respect to other issues. Northern moved for clarification on certain issues, but not on the availability of market rates after expiration of the initial contracts. See *Northern Natural Gas Co*., 122 FERC ¶ 61,227, *order on reh'g and clarification*, 122 FERC ¶ 61,270 (2008). It maintained, in the clarification proceeding, that it was "at a definitive decision point (i.e., 'go or no go')" and could not proceed without the desired clarification. J.A. 381. Northern's failure to call for assurance on availability of market rates after 20 years is obviously telling.

Even if Northern had offered evidence that it detrimentally relied on the 2007 Order, the limitation it proposes would be inappropriate. Reliance must be not only detrimental, but also reasonable. *Pub. Serv. Co. of Colorado*,, 91 F.3d at 1490. Northern could not reasonably have expected to secure market-based rates past the expiration of the initial contracts on the basis of the final paragraph of the 2007 Order. First, the language in the 2007 Order is arguably dictum. The Commission accepted Northern's view that there was no immediate need to decide the nature of the rates to which the right of first refusal would apply. The Commission's aside was superfluous.

Second, even on its own terms, the language does not suggest that market-based rates would *necessarily* be available. The Commission stated that it would "determine [at the contract's expiration] whether the protections are adequate and *the extent to which market-based rates should apply* beyond the primary term of the service agreement." 120 FERC ¶ 61,233 at 61,974 (2007) (emphasis added). The 2007 Order thus did not pass judgment on that "extent."

This is not to say that the 2007 Order made clear that the Commission would, a few years later, reject Northern's petition for an extension of its ability to charge market rates. To the contrary, the Commission's language may well have been misleading. Dictum is at least as risky for the Commission as it is for courts. But, for the reasons discussed above, the misleading characterization of Northern's future options does not provide a basis for precluding the Commission from applying to the Iowa project the interpretation that is demanded by § 4(f) and that it has uniformly embraced except for the utterance in the 2007 Order.

\* \* \*

The petition for review is therefore

*Denied*